IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 13-cv-01899-PAB-GPG

ERIC A. HEINRICH,

      Plaintiff,

v.

MASTER CRAFT ENGINEERING, INC., a Michigan corporation,
AUTO CENTER MANUFACTURING CO., a Florida corporation,
AUTOCRAFT MANUFACTURING CO., INC., a Florida corporation, and
JEG'S AUTOMOTIVE, INC., an Ohio corporation, a/k/a JEG'S, JEGS, JEG'S High
Performance and JEGS High Performance,

      Defendants.

_____

**ORDER**
_____

      This matter is before the Court on the Motion for Summary Judgment [Docket

No. 101] filed by defendant Master Craft Engineering, Inc. ("Master Craft"), the Motion

for Partial Summary Judgment Regarding Plaintiff's Pursuit of Exemplary Damages and

Regarding Plaintiff's Negligence Claim [Docket No. 102] filed by defendant JEG's

Automotive, Inc. ("Jeg's") and the Motion for Partial Summary Judgment [Docket No.

103] filed by plaintiff Eric Heinrich.

## I. BACKGROUND[1]

      On July 30, 2011, plaintiff attended a drag race at the Western Colorado

Dragway in Mesa County, Colorado (the "Dragway").  Docket No. 111-1 at 1, ¶ 2.  Drag

racing events at the Dragway are sanctioned by the National Hot Rod Association

_____

      [1]The following facts are undisputed by the relevant parties unless otherwise
indicated.

("NHRA").  Docket No. 101 at 4, ¶ 2.  That evening plaintiff was providing mechanic services and assistance to one of the drivers.  Docket No. 111-4 at 1, ¶ 4.  While standing near the drag race tracks, plaintiff was struck in the leg by a piece of metal from a nearby 1986 Chevrolet S10 race vehicle driven by Ethan Savoya.  Docket No. 111-1 at 2, ¶¶ 7-14.  He suffered severe injuries and was hospitalized as a result.  *Id.* at 2, ¶¶ 9-12.  Plaintiff alleges that the welds securing the balance weight to the flexplate (the "balance weight welds") were defective.

The piece of metal that struck plaintiff was a balance weight from an externally balanced flexplate (the "flexplate").  A flexplate is a steel disk, to which an outer ring gear has been welded, that mounts between the engine crankshaft and the automatic transmission converter.  Docket No. 102 at 3, ¶¶ 2-3.  Flexplates are designed to, among other things, connect the transmission torque converter and the engine as well as balance engine vibrations.  Docket No. 101 at 1 n.1; Docket No. 111-5 at 4, p. 24:1-3; *see, e.g.*, Docket No. 101-5.  Externally balanced flexplates have a balance weight welded on one side of the flexplate, Docket No. 101 at 1 n.1; *see, e.g.* Docket No. 101-5, whereas internally balanced flexplates do not.

The SFI Foundation ("SFI") is a testing body for the performance automobile industry.  Docket No. 111-11 at 8, pp. 214:20-215:12; Docket No. 102 at 4, ¶ 4.  SFI establishes quality standards and conducts tests on flexplates and other motor vehicle parts that are used in racing.  Docket No. 111 at 5, ¶ 26.  The SFI standard for flexplates used in race vehicles is SFI Spec 29.1.  Docket No. 111-11 at 8, p. 215:13-23; Docket No. 101 at 2 n.2; Docket No. 102 at 4, ¶ 5.  SFI does not test the integrity of balance weight welds.  Docket No. 102 at 4, ¶ 6.  Manufacturers submit representative

2

samples of flexplates to SFI for testing and, if the flexplates pass SFI's tests, SFI issues decals to the manufacturer to affix to its flexplates. Docket No. 102 at 4, ¶¶ 6-7. Externally balanced flexplates make up approximately half of the flexplates used in drag racing. Docket No. 102 at 5, ¶ 11. The NHRA has adopted SFI standards and requires vehicles running in sanctioned drag racing events to undergo an inspection to ensure that certain parts, including flexplates, carry valid SFI certifications. Docket No. 101 at 4, ¶ 3. Inspectors examine the flexplates installed in each vehicle for an SFI certification sticker and a valid date stamp. *Id.* at 4, ¶ 5. All vehicles that race at the Dragway are required to undergo such an inspection. *Id.* at 4, ¶ 4. If a race vehicle does not have an SFI certification sticker on its flexplate, the car will not be permitted to race at the facility. *Id.* at 4, ¶ 6. Docket No. 101-3 at 2, p. 88:18-20.

On the day of the incident, Mr. Savoya's vehicle was inspected to verify that he had an SFI certified flexplate as required for vehicles, such as Mr. Savoya's, attempting to run a quarter mile in 9.99 seconds or less. Docket No. 101 at 4-5, ¶¶ 8-9, 13; Docket No. 101-4 at 8, p. 62:10-18; *id.* at 4, p. 32:2-21.[2] The flexplate had an SFI certification sticker and Mr. Savoya's race vehicle otherwise passed inspection. Docket No. 101 at 5, ¶ 10.

---

[2]Jeg's argues that, because Mr. Savoya's vehicle did not actually succeed in running the quarter mile in less than ten seconds, SFI certification was not required. Docket No. 102 at 7, ¶ 24. Jeg's does not, however, dispute that Mr. Savoya was attempting to run the quarter mile in less than ten seconds or dispute the fact that vehicles without appropriate SFI certification stickers are not permitted to race at the Dragway. Docket No. 101 at 4, ¶ 6.

### A.  Manufacture and Distribution

#### 1.  *Master Craft and Autocraft*

Master Craft manufactured flexplates for defendants Autocraft Manufacturing

Company, Inc. and Autocraft Manufacturing Company (collectively, "Autocraft") from

1981 until 2014.  Docket No. 111 at 6, ¶ 32; Docket No. 103 at 5, ¶ 5.  Master Craf t

knew that Autocraft was a wholesaler of autoparts, but did not know who Autocraft's

customers were.  Docket No. 111 at 7, ¶ 35; Docket No. 122 at 6, ¶ 36.  Model 3877

flexplates, the model at issue, were meant for installation and use in a Chevrolet 454

cubic inch, big block engine.  Docket No. 111 at 4, ¶ 19; Docket No. 122 at 4, ¶ 19.[3]  In

the eight years before June 2012, Master Craft manufactured 17,000 flexplates, 9000

of which were model 3877 flexplates.  *Id.*; Docket No. 122 at 5, ¶ 32.  All of the

flexplates Master Craft manufactured were sold to Autocraft, Docket No. 111 at 4, ¶ 21,

and Master Craft was Autocraft's sole supplier of flexplates. Docket No. 103 at 5, ¶¶ 6-

7.

In 1988, Master Craft advised Autocraft that it had not manufactured and would

not manufacture parts for high performance or racing vehicles.  Docket No. 101 at 4,

¶ 1; Docket No. 101-1.  Since at least 1995, at Autocraft's direction, all flexplates

Master Craft manufactured for Autocraft were stamped with the words "NON SFI" in the

---

[3]Master Craft admits that it manufactured a flexplate model that could be
installed in a Chevy 454 big block engine.  Docket No. 122 at 4, ¶ 19.  However, it is
somewhat unclear whether Master Craft knew what engine model 3877 flexplates were
designed to fit.  Master Craft's owner and Fed. R. Civ. P. 30(b)(6) witness James
Haswell testified that, although he did not know precisely what vehicle the flexplate
model was designed for, he could have determined such a fact with minimal effort.
Docket No. 111-5 at 19, pp. 254:21-255:17.

metal of the flexplate itself.  Docket No. 111 at 5, ¶ 25; Docket No. 111-5 at 12, p.

147:7-20.  Mr. Haswell testified that the purpose of such a stamp was to "let my

customer know, Autocraft and anybody else who gets their hands on that flexplate, that

it's not SFI foundation approved."  Docket No. 111-5 at 12, p. 145:21-24; *see also*

Docket No. 111 at 6, ¶ 28.  He also testified that model 3877 flexplates were intended

to be sold in the "muscle car market," which he defined as "an average avid mechanic

building his car in the garage" to increase horsepower.  Docket No. 111-5 at 23-24, pp.

276:21-277:6.

    The parties do not dispute that Autocraft paid for tools and dies[4] that Master

Craft used to manufacturer externally balanced flexplates.  Docket No. 103 at 5-6, ¶¶ 8-

9.  Plaintiff and Autocraft do not agree on the question of how much direction Autocraft

provided Master Craft in the manufacture of model 3877 flexplates.  Plaintiff asserts

that Autocraft directed Mastercraft to reverse engineer a flexplate made by an original

equipment manufacturer ("OEM") and that Autocraft directed to Master Craft to add

additional features.  Docket No. 103 at 6, ¶ 10.  In an interrogatory response, Autocraft

states that the flexplates it purchased from Master Craft were reverse engineered, and

that the reverse engineering process is "refined often through verbal negotiations and

discussions when samples are fabricated."  Docket No. 103-9 at 3.  Autocraft further

states that it requested that Master Craft incorporate features in addition to the OEM

specifications, including extra tack and spot welds on the balance weights, stamping the

words NON SFI and "made in the USA" on the flexplate, zinc dichromate coating, and

---

    [4]Tools and dies refer to casts or molds that a manufacturer would use to form a
part.  Docket No. 109 at 3 n.2.

thicker metal as compared to an OEM flexplate.  *Id.*  It is, however, unclear when and

on how many occasions Autocraft requested that Master Craft perform additional

welding on the balance weights.  Autocraft admits that, in October 2011, after the injury

to plaintiff, it made such a request.  Docket No. 103-9 at 9.  And plaintiff cites a letter

dated November 23, 1988 (the "November 1988 letter") from Master Craft to Autocraft

that refers to "guidelines set forth by [Autocraft]," and states that the "[b]alancing

weights are not only resistance welded but are also mig welded for better holding power

of these weights."  Docket No. 103-12.[5]  However, Mr. Haswell also testified that,

between 2004 and October 2011, the balance weights were not spot welded.  Docket

No. 109-1 at 12-13, pp. 70:1-71:10.  Mr. Haswell testified that Master Craft

manufactured the flexplate according to specifications provided by Autocraft, including

Autocraft's request that Master Craft to use thicker material for the flexplate, weld both

sides of the ring gear, and use a different type of metal for the flexplate itself.  Docket

No. 103-6 at 6-7, pp. 52:18-53:1; *Id.* at 7, p. 56:9-12; *Id.* at 12, p. 124:2-5.  Mr. Haswell

testified that model 3877 flexplates were "heavy duty," meaning that, unlike standard

flexplates, they were 20 thousandths of an inch thicker, welded on both sides, and

plated.  Docket No. 111-5 at 10, p. 106:16-19.

 In response, Autocraft asserts that, although it provided Master Craft with a

sample flexplate from which to reverse engineer the model 3877 flexplate and

requested customized features or guidelines for the flexplate, it "did not provide

---

 [5]MIG or arc welding is typically done by hand and uses wire to fuse two metals
together.  Docket No. 111-5 at 6, p. 50:16-51:22.  Spot welding is a process by which
electricity fuses two metals together.  Docket No. 109-1 at 13, p. 71:19-24.  The terms
"spot welding" and "resistance welding" refer to the same process.  *Id.* at 14, p. 79:6-11.

technical 'specifications' to Master Craft."  Docket No. 109 at 4, ¶ 10; *see also* Docket No. 103-8 at 3, p. 25:15-22 (stating that Autocraft provided guidelines, but not specifications, for the flexplates it purchased).  Rather, Master Craft's employees deduced the necessary technical specifications from the OEM flexplate.  Docket No. 109 at 4, ¶ 10 (citing Docket No. 103-6 at 9, p. 88:2-4 ("Q.  So how did you know the specifications of what to build?  How did your company know that?  A.  We cop[ied] an OEM flywheel.")).  Autocraft disagrees with plaintiff's characterization of the November 1988 letter, contending that it discusses "guidelines" for the flexplate, but not technical specifications.  *Id.*

The flexplate at issue was manufactured by Master Craft and bore a NON SFI stamp when it left Master Craft's facility.  Docket No. 101 at 5, ¶ 14.  Other than Jeg's placing an SFI certification sticker over that stamp, no other physical alterations were made to the flexplate after it left Master Craft's facility.  Docket No. 111 at 7, ¶ 37.  Autocraft sold thousands of Master Craft flexplates to at least four different customers, including Jeg's.  Docket No. 111 at 7, ¶ 36.  Autocraft sold the flexplate at issue to Jeg's.  Docket No. 111 at 5, ¶ 24.

### 2. *Jeg's*[6]

Jeg's is an auto parts distributor that purchased flexplates from Autocraft.  Jeg's believed that Autocraft manufactured the flexplates it sold.  Docket No. 108 at 9, ¶ 6.  Jeg's admits that it is in the business of selling flexplates and that it sold the flexplate at issue.  Docket No. 103 at 11, ¶¶ 46-47.  When Jeg's received the flexplate from

---

[6]Additional facts relevant to Jeg's motion for partial summary judgment are set forth below.

Autocraft, it bore the NON SFI stamp in the metal.  Docket No. 111 at 5, ¶ 25.

Jeg's submitted an internally balanced flexplate it purchased from Autocraft to SFI for testing.  Docket No. 102 at 6, ¶ 19.  Jeg's does not indicate what model of flexplate it submitted to SFI.[7]  The internally balanced flexplate passed SFI's 29.1 testing.  *Id.*  As a result, Jeg's issued instructions to its employees to cover up the NON SFI stamp on both internally and externally balanced flexplates with an SFI certification sticker, which indicated that the flexplates were SFI certified.  Docket No. 101 at 5, ¶ 14; Docket No. 102 at 7, ¶ 20.  The flexplate itself and the SFI certification sticker did not bear Jeg's name, but the sticker stated, among other things, "This Manufacturer Certifies That This Product Meets SFI SPEC 29.1."  Docket No. 103 at 9, ¶ 33; Docket No. 108 at 6, ¶ 34; *see also* Docket No. 101-5.  The words "This Manufacturer" on the SFI sticker refers to Jeg's.  Docket No. 103 at 9, ¶ 34.

Jeg's is listed on SFI's website as a manufacturer of flexplates.  Docket No. 103 at 10, ¶ 39.  Flexplates identical to the one at issue are identified in Jeg's catalog and on Jeg's website as a "Jeg['s] product."  *Id.* at 9, ¶ 37; *see also* Docket No. 103-4 at 5 ("Jeg's admits that the flexplate was identified in Jeg's catalog as a Jeg's flexplate."). Jeg's advertises its Jeg's brand products, including the flexplate, as "meticulously engineered and manufactured to the highest quality standards to not only perform but be long lasting and dependable."  Docket No. 103 at 10, ¶ 40; Docket No. 108 at 7, ¶ 40.  Jeg's Rule 30(b)(6) witness Richard Smith was asked whether this particular

---

[7]Jeg's expert witness states that Jeg's part number 555-60155 is the externally balanced flexplate at issue.  Docket No. 102-1 at 2, ¶ 5.  Jeg's part number 555-60151 is an internally balanced flexplate and is the same as a part number 555-60155 flexplate, but without a balance weight.  *Id.* at 3, ¶ 8.

8

statement implies that parts sold under the Jeg's brand are manufactured by Jeg's and stated, "You can read anything in it you want, but this to me is typical advertising fluff" and denied knowing whether internal discussions occurred as to the inaccuracy of this statement.  Docket No. 103-13 at 14, p. 257:18-22; *id.* at 14, p. 259:16-22.  Mr. Smith also testified:

> Q   And in your opinion, a consumer reading this does not have the understanding that Jeg's manufactures this – these products that are listed as Jeg's performance products?
>
> A   Some may and some may not.  There's people that know, you know, where products come from and who's – and who is the manufacturer, and sometimes, you know, they would interpret this as being Jeg's parts.  Not everybody has the same outlook on reading what they see.
>
> Q   So circling back to earlier, the flexplates sold to Jeg's by ACM have no markings to identify a manufacturer, correct?
>
> A   Right.
>
> Q   There are no identifications on the catalog or on the Website as to the actual manufacturer of the product, correct?
>
> A   Right
>
> Q   So how is a consumer reading this statement looking at the catalogs and the Website for the flexplates sold by Jeg's under the Jeg's brand to determine who's the manufacturer?
>
> A   They would believe that Jeg's is the manufacturer.

*Id.* at 14, pp. 259:24-260:22; *see also id.* at 10, p. 242:4-10.

Mr. Savoya ordered the flexplate from Jeg's by phone.  Docket No. 108-4 at 6, p. 65:12-25.  Mr. Savoya does not specifically recall viewing Jeg's catalog or website immediately prior to ordering the flexplate.  *Id.* at 6-7, pp. 65:12-66:10.  Mr. Savoya testified that he believed Jeg's to be a "parts house," which he defined as "a parts retail

9

center.  Q  Okay.  But not the manufacturer, correct?  A  Yes."  *Id.* at 3, p. 12:13-21.

Jeg's argues that this testimony establishes that Mr. Savoya knew that Jeg's did not

manufacture the flexplate.  However, Mr. Savoya was later asked directly if he knew

who manufactured the flexplate when he purchased it and answered "No. . . . I mean,

Jeg's could have made it for all I know.  I don't know who made it.  I didn't ask them."

Docket No. 114-3 at 3, p. 86:13-19.  When Mr. Savoya purchased the flexplate from

Jeg's, he intended to purchase an SFI certified flexplate and would not have purchased

a flexplate that was not SFI certified.  Docket No. 101 at 5, ¶¶ 11-12; Docket No. 101-4

at 5, p. 67:5-7; *Id.* 7, p. 87:3-4.  The parties do not dispute that the flexplate was sent to

Mr. Savoya in a cardboard box labeled "Jeg's," which was inside a larger shipping box

labeled "Jeg's."  Docket No. 103 at 10, ¶ 44; Docket No. 108 at 8, ¶ 44.  Jeg's admits

that "it did not disclose to Mr. Savoya the identity of the actual manufacturer of the

Flexplate when it sold the Flexplate to Mr. Savoya."  Docket No. 108 at 8, ¶ 45.  Mr.

Savoya installed the flexplate in his 1986 Chevy S10 race vehicle.  Docket No. 111-2 at

2, pp. 9:1-12:6.

### B.  Expert Opinions

Plaintiff's expert witness Joseph Skaggs opines that welds attaching the balance

weight to the flexplate were defective, in part, because the welds were out of position

and did not fully penetrate into the balance weight.  Docket No. 111-16 at 4.  Mr.

Skaggs further states that, although the maximum recommended engine speed for a

stock Chevrolet big block engine was 5500 RPM, the RPM range of Mr. Savoya's race

vehicle was "4500 for burnout and 6000 RPM otherwise."  *Id.* at 5.  Because the welds

failed within the maximum RPM range of 4500 RPM and because Master Craft should have known that a big block Chevrolet engine would reach an RPM of at least 5500, the flexplate "was unsuitable for use in any application." *Id.* at 4-5.  Mr. Skaggs also opined that the welds did not fail as a result of fatigue.  *Id.* at 9.  He testified that defective balance weight welds could have been discovered through a visual inspection.  Docket No. 106-6 at 2-3, pp. 40:23-41:25.  Master Craft's expert witness Jesse Grantham disputes that the welds were defective, opining that the welds attached to the flexplate failed due to improper installation of the flexplate in the vehicle.  Docket No. 102 at 8, ¶ 29.

In July 2014, the flexplate underwent laboratory and metallographic testing. Docket No. 111-17 at 2.  Plaintiff's expert witness Bastiaan Cornelissen, Ph.D, opined that the balance weight "separated from the flexplate because the welds securing the balance weight were not properly made" and that the "ultimate failure of the flexplate occurred during a rev-limited burnout prior to a race, indicating that the small fused areas of the welds failed progressively in a series of small overload events."  *Id.* at 5; *see also* Docket No. 111-15 at 1 ("Weld fusion appears unsatisfactory on the counterweight.").[8]

### C.  Procedural History

On July 17, 2013, plaintiff filed this case.  Docket No. 1.  On June 2, 2014, plaintiff filed his First Amended Complaint [Docket No. 64], which asserts claims for strict products liability, negligence, and breach of warranty against all defendants.  *Id.* at

---

[8]The parties do not dispute the admissibility of the expert opinions provided in support of or in response to the present motions.

18-27.  Plaintiff also seeks exemplary damages against Autocraft and Jeg's.  *Id.* at 28-

29.  On December 1, 2014, Master Craft, Jeg's, and plaintiff filed the present motions

for summary judgment.  Docket No. 101-103.  No final pretrial order has been entered

in this case.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when

the "movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson*

*v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if

under the relevant substantive law it is essential to proper disposition of the claim.

*Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes

over material facts can create a genuine issue for trial and preclude summary

judgment*.  Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An

issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a

verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir.

1997).

However, when "the moving party does not bear the ultimate burden of

persuasion at trial, it may satisfy its burden at the summary judgment stage by

identifying a lack of evidence for the nonmovant on an essential element of the

nonmovant's claim."  *Bausman v. Interstate Brands Corp.,* 252 F.3d 1111, 1115 (10th

Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998))

(internal quotation marks omitted).  "Once the moving party meets this burden, the

burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)). The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e). "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman,* 252 F.3d at 1115 (citing *Hulsey v. Kmart, Inc.,* 43 F.3d 555, 557 (10th Cir.1994)). "In applying this standard, we view all facts and any reasonable inferences that might be drawn from them in the light most favorable to the nonmoving party." *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).

## III. MASTER CRAFT'S MOTION FOR SUMMARY JUDGMENT

### A. Causation

Master Craft argues that plaintiff's claims against it fail for lack of causation. Master Craft acknowledges that there is a dispute of fact as to whether the balance weight welds were defective; however, Master Craft asserts that Jeg's conduct caused plaintiff's injuries. Docket No. 101 at 8.

Colorado courts generally break the causation inquiry into two parts: causation in fact and legal causation. *Reigel v. SavaSeniorCare L.L.C.*, 292 P.3d 977, 985 (Colo. App. 2011).

### 1.  Causation in Fact

As to causation in fact, a plaintiff must establish either that "(1) but for the defendant's alleged negligence, the claimed injury would not have occurred, or (2) the defendant's alleged negligence was a necessary component of a causal set that would have caused the injury." *Id.* at 987 (citing *June v. Union Carbide Corp.*, 577 F.3d 1234, 1245 (10th Cir. 2009)).  The latter test is appropriate where "some events unrelated to the defendant's conduct may also have contributed to bringing about the claimed injury." *Id.* at 985.  The Court does not understand Master Craft to argue that plaintiff has failed to raise a genuine issue of fact regarding causation in fact.  There is no dispute that the balance weight from a Master Craft flexplate caused plaintiff's injuries and plaintiff has established a dispute of fact as to whether Master Craft negligently or defectively welded the balance weight to the flexplate.  A reasonable fact finder could conclude that the negligent or defective balance weight welds were a necessary component of a causal set that caused plaintiff's injury.

### 2.  Legal Causation

Once causation in fact is established, "legal causation must then be determined." *Moore v. W. Forge Corp.*, 192 P.3d 427, 436 (Colo. App. 2007).  Because "tort law does not impose liability on an actor for all harm factually caused by the actor's tortious conduct," *Boulders at Escalante LLC v. Otten Johnson Robinson Neff & Ragonetti PC*, --- P.3d ----, 2015 WL 3776866, at *8 (Colo. App. June 18, 2015), the doctrine of legal causation is "an attempt to spell out rules of law limiting the liability of a negligent actor, using the *language* of causation." *Moore*, 192 P.3d at 436 (emphasis in

14

original).  Along those lines, intervening causes that are reasonably foreseeable do not ordinarily relieve a defendant of liability.  *Jones v. Caterpillar Tractor Co.*, 701 P.2d 84, 86 (Colo. App. 1984); *see also Redden v. SCI Colo. Funeral Servs., Inc.*, 38 P.3d 75, 81 (Colo. 2001) ("An intervening cause only relieves the defendant of liability if it was not reasonably foreseeable.").  "Reasonably foreseeable intervening causes must be viewed as within the scope of the original risk created by a defendant's negligence, if any, even to the extent of the foreseeable negligence on the part of third parties." *Bradford v. Bendix-Westinghouse Automotive Air Brake Co.*, 517 P.2d 406, 414 (Colo. App. 1973).

Master Craft's causation argument is based primarily on undisputed facts.  Jeg's covered the flexplate's NON SFI stamp with an SFI certification sticker.  Mr. Savoya testified that he would not have purchased a flexplate with a NON SFI designation.  Moreover, Mr. Savoya would not have been permitted to operate his race vehicle at the Dragway unless the vehicle had an SFI certification sticker on the flexplate.  As a result, Master Craft argues that, but for Jeg's placement of an SFI certification sticker over the NON SFI stamp, (1) Mr. Savoya would not have purchased the flexplate, (2) the allegedly defective flexplate would not have been installed in Mr. Savoya's race vehicle on July 30, 2011, and (3) the flexplate would not have injured plaintiff.  Docket No. 101 at 9-10.  In response, plaintiff does not dispute the fact that, but for Jeg's conduct, the flexplate would not have been installed in Mr. Savoya's race vehicle.  Rather, plaintiff argues that, because the balance weight welds would have broken during normal or racing use, the defective balance weight welds – not the racing use of the flexplate – caused plaintiff's injuries.  Docket No. 111 at 9-10.  Both parties' arguments, however,

15

fail to properly analyze this issue in terms of whether Jeg's actions constitute a reasonably foreseeable intervening cause.

Foreseeability is ordinarily a question of fact. *See Westin Operator, LLC v. Groh*, 347 P.3d 606, 614 n.5 (Colo. 2015). Where, as here, there are multiple factual causes of a plaintiff's injuries,

> [a] defendant's conduct "is not a cause of another's injuries if, in order to bring about such injuries, it was necessary that the conduct combine or join with an intervening cause which also contributed to cause the injuries, but which intervening cause would not have been reasonably foreseen by a reasonably careful person under the circumstances."

*Moore v. W. Forge Corp.*, 192 P.3d 427, 436 (Colo. App. 2007) (quoting *Scharrel v. Wal-Mart Stores, Inc.*, 949 P.2d 89, 93 (Colo. App. 1997)); *see also Groh*, 347 P.3d at 614 n.5 (noting that foreseeability is the "touchstone" of legal causation). Foreseeability "depends in part on the common sense consideration of the risks created by various conditions and circumstances." *Walcott v. Total Petroleum, Inc.*, 964 P.2d 609, 612 (Colo. App. 1998) (quoting Restatement (Second) of Torts § 435 cmt. c. ("Where it appears to the court in retrospect that it is highly extraordinary that an intervening cause has come into operation, the court may declare such a force to be a superseding cause."). Thus, the question is whether the harm plaintiff suffered was "within the scope of the risk created by defendant's conduct." *Scharrel*, 949 P.2d at 94. "[T]he fact that the harm is brought about through the intervention of another force does not relieve the actor of liability, except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct." *Id.* "[I]t is not necessary that the tortfeasor be able to foresee the exact nature and extent of the

16

injuries or the precise manner in which the injuries occur, but only that some injury will likely result in some manner as a consequence of his negligent acts." *HealthONE v. Rodriguez ex rel. Rodriguez*, 50 P.3d 879, 889 (Colo. 2002); *see also Scharrel*, 949 P.2d at 94 ("an inability to reasonably foresee the particular intervening force that combined with [defendant's] conduct to cause the injuries d[oes] not relieve defendant of liability for its own negligence").

In *Rodriguez ex rel. Rodriguez v. HealthONE*, 24 P.3d 9, 12-13 (Colo. App. 2000), *rev'd on other grounds by* 50 P.3d 879 (Colo. 2002), an anesthesiologist left a vial of phenol on top of a hospital cart holding medications. Although labeled differently, the vial of phenol was otherwise identical to a vial of guanethidine. *Id.* Three weeks later, a second anesthesiologist mistakenly took the vial of phenol from the hospital cart, rather than a vial of guanethidine, and injected its contents into plaintiff, causing an adverse reaction requiring surgery. *Id.* After surgery, the second anesthesiologist injected plaintiff with too many sedatives while changing a dressing, causing plaintiff to suffer cardiac arrest. *Id.* Plaintiff brought suit against both anesthesiologists. *Id.* The Colorado Court of Appeals rejected the first anesthesiologist's argument that his conduct did not cause plaintiff's injuries, concluding that, "because there can be more than one proximate cause of [plaintiff's] injuries, [the first anesthesiologist's] actions may have proximately caused those injuries," notwithstanding the second anesthesiologist's actions. *Id.* at 15. Although the first anesthesiologist's actions took place three weeks before plaintiff's injuries, "his actions were not attenuated from the injury that occurred." *Id.*

17

The defective balance weight welds created a risk that the welds would fail while the flexplate was spinning, ejecting the balance weight at a high rate of speed.  From that risk, it is foreseeable that the balance weight would strike and injure a bystander such as plaintiff.  A reasonable juror could therefore find that plaintiff's injuries were within the scope of risk created by the defective balance weight welds.  *See Scharrel*, 949 P.2d at 94.  Because plaintiff's injuries are within the scope of risk created by defective balance weight welds, Master Craft's conduct may be considered a legal cause of plaintiff's injuries regardless of whether it could foresee the particular intervening effect of Jeg's conduct or foresee the precise manner in which plaintiff's injuries occurred.  *HealthONE*, 50 P.3d at 889; *Scharrel*, 949 P.2d at 94.

Master Craft argues that it was not foreseeable that Jeg's would cover up the NON SFI stamp, thereby allowing the flexplate to be used in a race vehicle.  Docket No. 101 at 8.  This argument is not, however, a sufficient basis upon which to grant Master Craft summary judgment as to causation.  First, as noted above, "[i]t is not necessary that the tortfeasor be able to foresee . . . the precise manner in which the injuries occur, but only that some injury will likely result in some manner as a consequence of the negligent acts."  *Koca ex. rel Aplar v. Keller*, 97 P.3d 346, 350 (Colo. App. 2004), *rev'd on other grounds by Keller v. Koca*, 11 P.3d 445 (Colo. 2005).  Thus, even though Master Craft may not have foreseen that a parts supplier such as Jeg's would cover up the NON SFI stamp, the fact that a reasonable manufacturer of flexplates could foresee injuries to bystanders from balance weights detaching due to improper welds does not render Master Craft not liable for injuries flowing from defective balance weight welds.  At best Master Craft's argument establishes that Jeg's conduct is one of multiple

18

proximate causes of plaintiff's injuries.  *See Rodriguez*, 24 P.3d at 15.  Second, a

reasonable juror could find it foreseeable that Master Craft's flexplates, particularly

those designed for use in larger engines, would be sold to people rebuilding cars to

increase horsepower, and that those flexplates would therefore spin at higher RPMs

than in an ordinary vehicle.  *See* Docket No. 111-5 at 23-24, pp. 276:21-277:6.  It is not,

therefore, wholly unforeseeable that Master Craft's flexplates would be used in higher

RPM applications, such as racing, and moreover, it is irrelevant whether Master Craft

could foresee the precise manner in which its flexplates would come to be used in

higher RPM applications.  *See Bradford*, 517 P.2d at 414.

Master Craft argues that "it would be pure speculation for any jury to conclude

that the balance weight would have detached in a non-racing application."  *See* Docket

No. 101 at 9.  Not only is this argument incorrect in light of Mr. Skaggs' opinions,[9] but

Master Craft does not, as is its burden, provide sufficient evidence to conclude, as a

matter of law, that the balance weight welds failed only because the flexplate was used

for racing.  In support of its assertion, Master Craft cites only a small portion of Mr.

Cornelissen's deposition testimony.  Mr. Cornelissen testified that, if 0 to 4500 RPMs

---

[9]To the extent Master Craft relies on *Truck Ins. Exchange v. MagneTek, Inc.*, 360 F.3d 1206 (10th Cir. 2004), such reliance is misplaced for the same reason.  In *Truck Insurance*, the Tenth Circuit considered whether plaintiff could establish causation in light of the fact that plaintiff presented no expert testimony on the issue of causation.  *Id.* at 1215.  The Court concluded that the jury could not find in plaintiff's favor on the issue of causation without engaging in speculation and held that defendant was entitled to summary judgment.  *Id.* at 1216.  Here, however, a jury could rely on Mr. Skaggs' opinion, the admissibility of which is unchallenged, that the balance weight welds were unsafe for any use and conclude that, regardless of whether the flexplate was used in a race vehicle, it was foreseeable that plaintiff's injuries would result from defective balance weight welds.

are achieved in a second and a half, the counterweight may receive a higher load than if 0 to 6000 RPMs are achieved in four seconds and, as such, "If you have a very high rate of acceleration, you could conceivably end up with higher load at lower RPM than you do at steady state when the thing is turning at 4500 RPM."  Docket No. 101-8 at 2, p. 110:2-21.  Master Craft fails to provide sufficient context for the portion of Mr. Cornelissen's deposition testimony upon which its argument relies and does not provide any additional expert testimony on the issue.  Moreover, a reasonable juror could reject Master Craft's argument in favor of Mr. Skaggs' opinion that the balance weight welds were unsafe for any use.  *See* Docket No. 111-16 at 4.

In essence, Master Craft's arguments assert that Master Craft could not have foreseen that a bystander would be injured by a balance weight ejected from a flexplate installed *in a race vehicle*.  Such an assertion, even if true, is no more than an argument that Master Craft could not have foreseen the precise manner in which plaintiff's injuries would occur, which does not relieve Master Craft of liability for injuries resulting from defective balance weight welds.  *See HealthONE*, 50 P.3d at 889. Although legal causation can, in some cases, be decided as a matter of law, *see, e.g. Walcott*, 964 P.2d 609, this is not such a case.  *Cf. Rodriguez*, 24 P.3d at 15-16. Master Craft's motion for summary judgment on the issue of causation is therefore denied.

### B.  Misuse

Master Craft argues that installation of the flexplate in a race vehicle constitutes a misuse sufficient to bar plaintiff's products liability claim pursuant to Colo. Rev. Stat.

§ 13-21-402.5.  Docket No. 101 at 10.

> A product liability action may not be commenced or maintained against a manufacturer or seller of a product that caused injury, death, or property damage if, at the time the injury, death, or property damage occurred, the product was used in a manner or for a purpose other than that which was intended and which could not reasonably have been expected, and such misuse of the product was a cause of the injury, death, or property damage.

§ 13-21-402.5.  "Misuse is a causation concept which excuses the seller of an admittedly defective product from liability when the misuse and not the defect caused the injury."  *White v. Caterpillar, Inc.*, 867 P.2d 100, 107 (Colo. App. 1993).  If the misuse of the product "is the *sole* cause of damages, and thus, the alleged defect was not a cause thereof, then the plaintiff cannot recover under strict liability theory."  *States v. R.D. Werner Co., Inc.*, 799 P.2d 427, 430 (Colo. App. 1990).  If, however, misuse of the product is not the sole cause, it may "constitute comparative fault which would reduce the plaintiff's recovery."  *Id.*; *see also* § 13-21-406 ("In any product liability action, the fault of the person suffering the harm, as well as the fault of all others who are parties to the action for causing the harm, shall be compared by the trier of fact . . . .").  Misuse is not a defense "if the consumer's misuse can be reasonably anticipated by the manufacturer."  *White*, 867 P.2d at 107; *see also Walcott*, 964 P.2d at 613-14 ("because the assailant's use of the gasoline was not reasonably foreseeable, it constituted misuse of the product").

As discussed above, Master Craft designed the flexplate for use in a Chevrolet 454 engine and anticipated that customers would purchase the flexplate with the intention of increasing horsepower.  *See* Docket No. 111-5 at 23-24, pp. 276:21-277:6.  Thus, there is a factual dispute as to what uses of the flexplate Master Craft could have

intended or reasonably expected.  *See* § 13-21-402.5 (defining misuse as use of a product "in a manner or for a purpose other than that which was intended and which could not reasonably have been expected").

Master Craft also argues that, because § 13-21-402.5 states that misuse is a defense if such misuse was "a" cause of the injury, the racing use of the flexplate need not be the sole cause of plaintiff's injuries in order to provide a complete defense to liability.  Docket No. 111 at 14.  Although there do not appear to be any published decisions interpreting the causation requirement of § 13-21-402.5, the Court rejects Master Craft's interpretation.  Colorado's products liability statutes would lose much of their effect if, as Master Craft suggests, every misuse constituting a but for cause of a plaintiff's injuries – regardless of foreseeability issues – was a complete defense to a products liability claim.  Moreover, "[a] statute is not presumed to alter the common law except to the extent that such statute expressly provides."  *Preston v. Dupont*, 35 P.3d 433, 440 (Colo. 2001).  Section 13-21-402.5 does not expressly abrogate the common law regarding causation and misuse; thus, the Court will not infer that § 13-21-402.5 alters the common law regarding causation.  *See, e.g.*, *Boles v. Sun Ergoline, Inc.*, 223 P.3d 724, 726 (Colo. 2010) (noting that General Assembly's enactment of products liability statutes has "never . . . fundamentally altered the nature of, or rationale for, a strict products liability claim").  Because Master Craft has not established that any misuse of the flexplate was the sole cause of plaintiff's injuries, the misuse defense is not a complete defense to plaintiff's products liability claims.  *See White*, 867 P.2d at 108.  Although the misuse defense may comparatively reduce Master Craft's fault, such is an issue for trial.  *See* § 13-21-406.  Master Craft's motion for summary judgment as

22

to the misuse defense is therefore denied.

### C.  Substantial Change

Master Craft argues that Jeg's act of placing the SFI certification sticker on the flexplate constitutes a substantial change in the condition of the flexplate, thereby relieving Master Craft of liability.  Docket No. 101 at 11.  To succeed on a strict liability claim based upon a manufacturing defect, a plaintiff must prove, among other things, that the product was expected to and did reach the consumer without substantial change in that condition.  *Barton v. Adams Rental, Inc.*, 938 P.2d 532, 536-37 (Colo. 1997) (citing *Union Supply Co. v. Pust*, 583 P.2d 276, 282-83 (Colo. 1978)); *see also Elvig v. Nintendo of Am., Inc.*, No. 08-cv-02616-MSK-MEH, 2010 WL 3803814, at *6 (D. Colo. Sep. 23, 2010).  The Colorado Supreme Court has emphasized, however, "that the expected change in the parts must be substantial; small changes and minor processing will not relieve the component part manufacturer of liability.  Of course, even substantial changes which do not affect a pre-existing design defect in parts do not absolve the manufacturer of liability."  *Pust*, 583 P.2d at 283.  There is no suggestion that placing the SFI certification sticker on the flexplate substantially changed the defective balance weight welds, and Master Craft does not cite any authority that a change to something other than the aspect of the product which is unreasonably dangerous constitutes a substantial change.  *Cf. Manning v. Ashland Oil Co.*, 721 F.2d 192, 195 n.3 (7th Cir. 1983) (rejecting argument that label constituted substantial change in lacquer thinner because, although a significant cause of the accident, "the label did not alter the dangerousness of the lacquer thinner as a tar stain remover").

Thus, it is not clear that the act of placing the SFI certification sticker on the flexplate constitutes a substantial change.  Even assuming that the removal or obfuscation of the NON SFI warning label could constitute a change in the condition of the flexplate, such a change is not a substantial one unless Master Craft can establish that the balance weight welds would not have broken through normal, non-racing use of the flexplate. Master Craft fails to do so.  Master Craft's motion for summary judgment on this issue is therefore denied.

## IV.  PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff seeks summary judgment as to three elements of his products liability claim, namely, (1) that each defendant is a manufacturer as that term is defined under Colorado law, (2) that each defendant is in the business of selling flexplates, and (3) that each defendant sold the flexplate at issue.  Docket No. 103 at 2; *see also* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying . . . the part of each claim or defense . . . on which summary judgment is sought."); *Gray Ins. Co. v. Heggy*, 2012 WL 4128034, at *2 n.1 (W.D. Okla. Sep. 19, 2012) ("partial summary judgment, resulting in the disposition of less than the entire case or claim, is permitted").  Under the Colorado Products Liability Act ("CPLA"), Colo. Rev. Stat. § 13-21-401, *et seq.*, a product liability action is defined as

> any action brought against a manufacturer or seller of a product, regardless of the substantive legal theory or theories upon which the action is brought, for or on account of personal injury, death, or property damage caused by or resulting from the manufacture, construction, design, formula, installation, preparation, assembly, testing, packaging, labeling, or sale of any product, or the failure to warn or protect against a danger or hazard in the use, misuse, or unintended use of any product, or the failure to provide proper instructions for the use of any product.

24

§ 13-21-401(2).  A manufacturer is defined as

> a person or entity who designs, assembles, fabricates, produces, constructs, or otherwise prepares a product or a component part of a product prior to the sale of the product to a user or consumer. The term includes any seller who has actual knowledge of a defect in a product or a seller of a product who creates and furnishes a manufacturer with specifications relevant to the alleged defect for producing the product or who otherwise exercises some significant control over all or a portion of the manufacturing process or who alters or modifies a product in any significant manner after the product comes into his possession and before it is sold to the ultimate user or consumer.  . . . A seller not otherwise a manufacturer shall not be deemed to be a manufacturer merely because he places or has placed a private label on a product if he did not otherwise specify how the product shall be produced or control, in some significant manner, the manufacturing process of the product and the seller discloses who the actual manufacturer is.

§ 13-21-401(1).  A "seller" is defined as "any individual entity, including a manufacturer, wholesaler, distributor, or retailer, who is engaged in the business of selling . . . any product for resale, use, or consumption."  § 13-21-401(3).

### A.  Master Craft

Master Craft's argument opposing plaintiff's motion is essentially nonresponsive. Master Craft does not dispute that it is a manufacturer, that it is engaged in the business of selling flexplates, and that it manufactured the flexplate at issue.  Docket No. 110 at 3, ¶¶ 1-4.  Rather, Master Craft disputes plaintiff's motion simply by making the causation argument in its summary judgment motion.  For the reasons stated above, Master Craft does not provide sufficient evidentiary support for its position that, but for the use of the flexplate in a racing application, the balance weight welds would not have failed.  Thus, not only are Master Craft's arguments irrelevant to plaintiff's motion, they are premised upon disputed issues of fact.  The Court need not further discuss such arguments in resolving plaintiff's motion.

### 1.  *"Manufacturer"*

Master Craft does not dispute that it manufactured the flexplate that was sold to Autocraft and injured plaintiff.  Docket No. 110 at 3, ¶ 2.  Rather, Master Craft argues that, because Jeg's placed an SFI certification sticker on the flexplate, thereby allowing for the flexplate to be used in a race vehicle, Jeg's – and no one else – should be considered the manufacturer of the flexplate.  *Id.* at 10-11.  Master Craft's argument is devoid of citation to relevant legal authority and is otherwise without merit.  Section 13-21-401 contemplates the possibility that a product can have more than one manufacturer.  Thus, the mere fact that Jeg's and Autocraft may also be considered manufacturers of the flexplate does not mean that Master Craft is not a manufacturer.

Master Craft argues that, because it has asserted a misuse defense under § 13-21-402.5, it ostensibly should not be considered a manufacturer of the flexplate.  Docket No. 110 at 10.  Master Craft's argument is untenable for multiple reasons.  First, for the reasons discussed above, Master Craft has failed to provide evidentiary support for its misuse defense.  Second,  Master Craft does not cite any legal authority in support of its position that, once a product is deemed to have been misused under § 13-21-402.5, the party who fabricated the product is no longer considered a manufacturer pursuant to § 13-21-401(1).  Third, § 13-21-402.5 suggests that the misuse defense is applicable only to "a manufacturer or seller."  Master Craft's assertion of the misuse defense therefore undercuts its argument that it is not a manufacturer.  Moreover, § 13-21-402.5 functions as a defense to liability, but does not somehow change the entity's status as a manufacturer.

Mr. Haswell testified that Master Craft manufactured the flexplate at issue in this

case, which included welding the balance weight to the flexplate.  Docket No. 103-6 at 12, p. 123:4-14; *see also* Docket No. 103-5 at 2.  Master Craft fails to create a genuine dispute of fact as to whether it "fabricates, produces, constructs, or otherwise prepares a product or a component part of a product prior to the sale of the product to a user or consumer."  *See* § 13-21-401(1) .  Thus, plaintiff is entitled to summary judgment on this element of his claim.

### 2.  Business of Selling Flexplates

In the eight years prior to June 2012, Master Craft manufactured 17,000 flexplates and sold those flexplates to Autocraft.  Docket No. 111 at 6, ¶ 32; Docket No. 122 at 5, ¶ 32; Docket No. 110 at 3, ¶ 3-4.  Master Craft does not dispute that it is engaged in the business of selling flexplates; rather, it argues that it is only engaged in the business of selling NON SFI flexplates.  Docket No. 110 at 3, ¶ 3; *see also id.* at 11-12.  Master Craft does not provide any authority in support of its position that this fact somehow defeats plaintiff's evidence on this element, and the Court finds no basis for so concluding.  Moreover, Master Craft fails to establish that it was the SFI-related use of the flexplate that caused the balance weight welds to break loose.  Docket No. 111 at 6, ¶ 32.  Thus, Master Craft fails to raise a genuine dispute as to this element and plaintiff is entitled to summary judgment.

### 3.  Sold the Flexplate at Issue

Master Craft concedes that it sold the flexplate at issue to Autocraft, but repeats its argument that, when it left Master Craft's facility, the flexplate was stamped NON SFI.  Docket No. 110 at 3, ¶ 4.  There is no evidence that the balance weight welds –

27

the aspect of the flexplate that plaintiff contends is unreasonably dangerous – were in any way altered after the flexplate left Master Craft's facility, which undercuts Master Craft's argument that the SFI certification sticker substantially altered the condition of the product.  *See Manning*, 721 F.2d at 195 n.3.  Moreover, to whatever extent Jeg's placement of an SFI certification sticker altered the flexplate, Master Craft fails to provide any authority supporting its contention that such an alteration somehow renders the flexplate a wholly different product for purposes of this element.  The Court has no basis to so conclude and therefore finds no genuine dispute of fact as to this element.

For the foregoing reasons, plaintiff's motion for summary judgment as to Master Craft will be granted.[10]

### B.  Autocraft

#### 1.  Manufacturer

Plaintiff argues that Autocraft is a manufacturer because it is (1) "a seller of a product who creates and furnishes a manufacturer with specifications relevant to the alleged defect for producing the product" and/or (2) a seller of a product "who otherwise exercises some significant control over all or a portion of the manufacturing process . . . ."  Docket No. 103 at 15 (citing § 13-21-401(1)).  Autocraft disputes that it is a manufacturer under either definition.

Turning first to the question of whether Autocraft created or furnished Master Craft with specifications relevant to the alleged defect, the parties agree that the defect

---

[10]In his reply brief, plaintiff requests that the Court sanction Master Craft under Fed. R. Civ. P. 11.  Docket No. 115 at 6.  Plaintiff's request is procedurally improper, *see* D.C.COLO.LCivR 7.1(d), and there is no motion for sanctions pending before the Court.  Plaintiff's request is therefore denied.

in the flexplate was an improperly welded balance weight.  Autocraft argues that plaintiff has not established that Autocraft instructed Master Craft on how to make the balance weight welds, including setting weld parameters, size and location of the weld, and quality control.  Docket No. 109 at 9-10.  In support of its argument, Autocraft cites testimony from Mr. Haswell, stating, among other things, that Master Craft supervisors instruct its welders on the size and location of the weld.  *See id.* (citing Docket No. 109-1 at 5, p. 44:2-15).  Autocraft also disputes the relevance of the November 1988 letter, arguing that it does not reflect the instructions it provided Master Craft during the relevant time period.  Mr. Haswell testified that, based upon the November 1988 letter, Master Craft was spot welding and mig welding the balance weights.  Docket No. 109-1 at 14, p. 79:18-21.[11]  In 2004, Mr. Haswell returned to Master Craft after working at a sister company.  He testified that, between 2004 and October 2011, the balance weights were only mig welded and that it was not until October 2011, when Autocraft requested spot welding and agreed to pay the additional cost, that Master Craft began spot welding (in addition to mig welding) the balance weights.  *Id.* at 12, pp. 70:1-71:10.  Autocraft argues that, because plaintiff's experts agree that the balance weight welds were not made at a high enough temperature and because Autocraft did not dictate to Master Craft the temperature of the welds, there is a genuine dispute of fact as to whether Autocraft furnished specifications relevant to the improperly welded balance weight.

---

[11]Although the November 1988 letter refers to "resistance welding," Mr. Haswell testified that "resistance welding" and "spot welding" are the same thing.  *Id.* at 14, p. 79:6-11.

Plaintiff argues that the November 1988 letter and Autocraft's October 2011 instructions to Master Craft establish that Autocraft furnished specifications to Master Craft relevant to the defective balance weight welds.  Docket No. 112 at 7.  Plaintiff further contends that the fact Autocraft did not dictate specifically how Master Craft should perform the welds does not, by itself, establish that Autocraft did not furnish specifications relevant to the balance weight welds.  *Id.*

Genuine disputes of material fact preclude summary judgment on this issue. Although the November 1988 letter may suggest that Autocraft directed Master Craft to spot and mig weld the balance weights, the letter could also be interpreted as Master Craft simply explaining how it chose to weld the balance weights.  *See* Docket No. 103-12.  The fact that, at some point between 1988 and 2004, Master Craft stopped spot welding the balance weights begs the question of whether the change was directed by Autocraft, of which there is no evidence.  Thus, there are disputes of fact as to what direction Autocraft provided Master Craft with respect to the balance weight welds and whether such direction constitutes a "specification" as that term is used in § 13-21-401(1).[12]  Moreover, even assuming that Autocraft specifically directed Master Craft to (or not to) spot and mig weld the balance weights, in light of the fact that Autocraft did not direct Master Craft as to the weld placement, size, and parameters, there remains a fact question as to whether such a specification is relevant to the particular defect

_____

[12]Although Autocraft prefers to characterize the directions it provided Master Craft as "guidelines," rather than "specifications," *see* Docket No. 109 at 4, ¶ 10, Autocraft does not identify any meaningful difference between the two terms or otherwise explain why providing only "guidelines" somehow renders its conduct outside the ambit of § 13-21-401(1).  In the absence of such an explanation, Autocraft's attempt to distinguish its conduct on this basis is unavailing.

alleged in this case.  Thus, plaintiff's motion for summary judgment on this issue is denied.

Plaintiff argues that Autocraft exercised significant control over the manufacturing process because it purchased tools and dies for Master Craft and directed every significant feature and specification of the flexplates.  Docket No. 103 at 15.  There appears to be little caselaw interpreting the term "significant control."  Courts considering the question have found that significant control entails something more than providing general specifications regarding the product, *see, e.g.*, *Watson v. Dillon Cos., Inc.*, 797 F. Supp. 2d 1138, 1161-62 (D. Colo. 2011), and more than ordering a particular feature on behalf of an end-user customer.  *See, e.g.*, *Bullock, ex rel. Bullock v. Daimler Trucks N. Am., LLC*, No. 08-cv-00491-PAB-MEH, 2010 WL 1380724, at *4 (D. Colo. March 30, 2010).  Autocraft argues that the purchase of tools and dies for Master Craft to use in manufacturing does not constitute sufficient control, in part because it was Master Craft who designed and made the dies to fit the task of fabricating flexplates.  Docket No. 109 at 14.  Plaintiff responds that "[t]his close, intertwined business arrangement is akin to a partnership between Master Craft and [Autocraft], with [Autocraft] deeply involved in controlling the manufacturing process by buying the tools and dies, and then purchasing one hundred percent (100%) of the end-product."  Docket No. 112 at 8.  Plaintiff's argument is unsupported by citation to the record and, moreover, is undercut by Mr. Haswell's testimony that Autocraft paid for only a portion of the equipment necessary to manufacture the flexplates.  *See* Docket No. 103-6 at 10, pp. 91:22-92:12.

Autocraft concedes that it provided Master Craft with an OEM flexplate from

31

which to reverse engineer the flexplate at issue, requested a thicker, exotic metal be used for the flexplate's inner plate, requested welding on both side of the ring gear, requested that the flexplate undergo zinc plating, directed Master Craft to stamp each flexplate with "NON SFI" and "Made in the USA," and, in 2011, requested that additional spot welds be used to secure the balance weight.  Docket No. 109 at 12, 16.  Autocraft nonetheless contends that there mere act of providing the OEM flexplate to Master Craft was no more than a general specification for how the flexplate should be manufactured and that the remaining changes Autocraft directed Master Craft to implement, even when considered together, did not constitute the exercise of control over the manufacturing process.  *Id.*  Plaintiff responds that this case can be distinguished from both *Watson* and *Bullock*.  Docket No. 112 at 9.  Plaintiff may be correct, but the mere fact that those cases are distinguishable does not, by itself, entitle him to summary judgment.  Plaintiff's only remaining argument on this issue is that Autocraft should be considered a manufacturer because, in 2011, it successfully directed Master Craft to spot weld the weights.  *Id.* at 8.  Although Autocraft may have had the ability to direct Master Craft to make certain changes to the manufacturing process, this does not, by itself, constitute significant control.

Although plaintiff has demonstrated that Autocraft exerted some control over the flexplate's design, features, and fabrication, whether that control constitutes a significant part of the manufacturing process is a question for the jury.  The Court cannot therefore conclude that plaintiff is entitled to summary judgment on this issue. Plaintiff does not assert that any of the other definitions of the term manufacturer apply

to Autocraft.[13]  Thus, plaintiff's motion for summary judgment as to whether Autocraft is

a "manufacturer" under § 13-21-401(1) will be denied.

Autocraft does not dispute that it is engaged in the business of selling flexplates

and that it sold the flexplate at issue.  Docket No. 103 at 8, ¶¶ 22-23; Docket No. 109 at

6, ¶¶ 22-23.  Thus, plaintiff's motion for summary judgment as to these two elements is

granted.[14]

### C.  JEG's

#### 1.  Manufacturer

Plaintiff argues that Jeg's is a manufacturer pursuant to the apparent

manufacturer doctrine and because it altered or modified the flexplate before the

flexplate was sold to Mr. Savoya.  Docket No. 103 at 12-13.

#### a.  Apparent Manufacturer Doctrine

The apparent manufacturer doctrine, as set forth in Restatement (Second) of

Torts § 400, provides that "[o]ne who puts out as his own product a chattel

manufactured by another is subject to the same liability as though he were its

---

[13]Plaintiff additionally argues that Autocraft should be considered a manufacturer because it represented itself in advertising as the manufacturer of the flexplates. Docket No. 103 at 16.  Plaintiff does not assert that this fact is relevant to any particular definition set forth in § 13-21-401(1) or that this renders Autocraft a manufacturer pursuant to the apparent manufacturer doctrine.  Moreover, plaintiff concedes that this fact is only anecdotal evidence that, while insufficient to "satisfy Colorado law for the definition of a manufacturer under products liability law, [] underscores the fairness of ordering that ACM is a manufacturer."  *Id.*  Even if plaintiff could establish that this fact is a relevant consideration under § 13-21-401(1), it would not warrant granting summary judgment in plaintiff's favor.

[14]Although Autocraft's response brief appears to request affirmative relief, Docket No. 109 at 17, such a request is procedurally improper and will therefore be denied.  *See* D.C.COLO.LCivR 7.1(d).

manufacturer."  The rationale for this rule is that, when an actor appears to be the

manufacturer of a product, the actor frequently causes the product "to be used in

reliance upon his care in making it" or, when the product appears to have been made

for the actor, the actor causes the product to be used in reliance "upon a belief that he

has required it to be made properly for him and that the actor's reputation is an

assurance to the user of the quality of the product."  *Id.* cmt. d.

Colorado courts have not expressly adopted § 400, nor has § 400 been

expressly codified in the CPLA.  Given the absence of authoritative precedent from the

Colorado Supreme Court, the question becomes whether, if presented with the

opportunity, the Colorado Supreme Court would apply the apparent manufacturer

doctrine in this case.  *See Lamb v. Rizzo*, 391 F.3d 1133, 1138 (10th Cir. 2004).  The

stated purpose of the CPLA is "to impose liability on those who create the risk of harm

by their involvement in the process which places the defective product in the stream of

commerce."  *Johnston v. Amsted Indus., Inc.*, 830 P.2d 1141, 1143 (Colo. App. 1992).

The last sentence of Colo. Rev. Stat. § 13-21-401(1) states,

> A seller not otherwise a manufacturer shall not be deemed to be a
> manufacturer merely because he places or has placed a private label on a
> product if he did not otherwise specify how the product shall be produced or
> control, in some significant manner, the manufacturing process of the
> product and the seller discloses who the actual manufacturer is.

The Tenth Circuit has recognized that this sentence is similar to § 400 of the

Restatement such that, "[b]y negative implication the statute allows a seller who places

a private label on a product without disclosing the actual manufacturer to be held liable

as a manufacturer."  *Yoder v. Honeywell Inc.*, 104 F.3d 1215, 1223 (10th Cir. 1997).  As

Judge Babcock concluded, the last sentence of Colo. Rev. Stat. § 13-21-401(1) "would

make no sense unless placement of a private label was otherwise sufficient to impose liability." *Long v. U.S. Brass Corp.*, 333 F. Supp. 2d 999, 1002 (D. Colo. 2004); *see also City & Cnty. of Denver v. Bd. of Assessment Appeals of State*, 30 P.3d 177, 180 (Colo. 2001) ("we afford the statute's language its ordinary and common meaning, giving effect to every term and provision").  The CPLA explicitly sets forth circumstances when sellers are not held strictly liable for an unreasonably dangerous product.  *See* Colo. Rev. Stat. § 13-21-401; § 13-21-402.  Sellers acting as apparent manufacturers are not among the listed circumstances.  Had the General Assembly wished to exclude apparent manufacturers from strict liability, it presumably could have done so explicitly. *See Long*, 333 F. Supp. 2d at 1003.[15]  Moreover, the stated rationale of the apparent manufacturer doctrine is consistent with the stated purpose of the CPLA.  *Compare* Restatement (Second) of Torts § 400 (1965) cmt. d., *with Johnston*, 830 P.2d at 1143. Of the jurisdictions to consider the issue, many have applied the doctrine to defendants who are in the chain of distribution.  *See Long*, 333 F. Supp. 2d at 1003 (collecting cases); *Seasword v. Hilti, Inc.*, 525 N.W. 2d 501, 503 n.3 (Mich. App. 1994), *vacated on other grounds by* 537 N.W.2d 221 (Mich. 1995) (same); *see also Lou v. Otis Elevator Co.*, 933 N.E. 2d 140, 146 (Mass. App. Ct. 2010) (collecting Massachusetts cases recognizing apparent manufacturer doctrine)*; Burkert v. Petrol Plus of Naugatuck, Inc.*, 579 A. 2d 26, 35 (Conn. 1990) (recognizing apparent manufacturer doctrine, but

---

[15]Although not binding, the Court notes that Colorado Jury Instructions, 4th – Civil § 14:2 (2015), defines a manufacturer as, among other things, "[a] seller who placed a private label on the product and did not disclose who the actual manufacturer is."  This particular aspect of § 14:2 does not appear to have been discussed by Colorado appellate courts.

declining to apply it to trademark licensor with no involvement in production, marketing, or distribution of product); *Warzynski v. Empire Comfort Sys., Inc.*, 401 S.E. 2d 801, 804 (N.C. App. 1991) (concluding that § 400 and North Carolina products liability statutes "can be read together and do not conflict" and adopting apparent manufacturer doctrine). *But see Bornsen v. Pragotrade, LLC*, 804 N.W. 2d 55, 59-61 (N.D. 2011) (holding that, because North Dakota products liability statutes "sharply curtail liability of a 'nonmanufacturing seller,'" North Dakota does not recognize apparent manufacturer doctrine); *Kennedy v. Guess, Inc.*, 806 N.E. 2d 776, 783 (Ind. 2004) (applying § 400 to negligence claims, but not to strict liability claims).[16]  In the absence of authority to the contrary, the Court finds *Long* persuasive and reaches the same conclusion for substantially the same reasons.

Jeg's does not dispute that the apparent manufacturer doctrine is generally applicable.  Rather, Jeg's argues that, in addition to proving that the defendant placed a private label on the product and did not disclose the identity of the actual manufacturer, a plaintiff seeking to assert the apparent manufacturer doctrine must show that the

---

[16]The apparent manufacturer doctrine has been criticized as unnecessary in light of § 402A of the Restatement (Second), which applies strict liability to sellers so long as they sell a defective product.  *See* Stephen C. Jarvis, Pure Confusion: Should Pure Licensors Share the Products Liability of Manufacturers and Sellers of Dangerously Defective Products, 61 DePaul L. Rev. 697, 704-05 (2012); *see also Seasword*, 525 N.W.2d at 503 (declining to apply apparent manufacturer doctrine in part because, under Michigan law, "both the manufacturer and the seller of a defective product are subject to liability for any injury arising from the product under the theories of breach of warranty and failure to warn").  However, as noted above, the CPLA explicitly sets forth circumstances under which sellers are and are not strictly liable for unreasonably dangerous products.  *See* Colo. Rev. Stat. § 13-21-401; § 13-21-402.  Thus, it is not clear that this particular criticism would preclude the Colorado Supreme Court from applying the apparent manufacturer doctrine.

consumer was actually misled, deceived, or suffered some unfairness or injustice related to defendant's labeling of the product.  Docket No. 108 at 14-15.  Jeg's does not, however, provide any legal authority from Colorado or other jurisdictions supporting its position.  Jeg's ostensibly relies on *Hebel v. Sherman Equipment*, 442 N.E. 2d 199, 203 (Ill. 1982), which states of the apparent manufacturer doctrine:

> The primary rationale for imposing liability on the apparent manufacturer of a defective product is that it has induced the *purchasing public* to believe that it is the actual manufacturer, and to act on this belief – that is, to *purchase the product in reliance* on the apparent manufacturer's reputation and skill in making it.

*Hebel* went on to hold that the relevant inquiry is whether a reasonable person, under the circumstances, would identify the defendant as the maker of a particular product. *Id.* ("That a casual observer, viewing the machines after their purchase and installation, might think otherwise does not mean that a reasonable purchaser of car-washing equipment, such as Glenbrook, would rely on such an impression.").  *Hebel* therefore contradicts Jeg's position that the apparent manufacturer doctrine applies only when a specific consumer is subjectively deceived.  Jeg's also relies on *Watson* for the proposition that other elements, such as causation or reliance, may be required under an apparent manufacturer theory.  Docket No. 108 at 14.  However, the court in *Watson* allowed a plaintiff to proceed on an apparent manufacturer theory, but expressly declined to decide "whether any other elements are required, such as causation or reliance."  797 F. Supp. 2d at 1162.  It does not appear that the court in *Watson* subsequently had occasion to rule on the issue.  Thus, Jeg's reliance on *Watson* is unpersuasive.

Jeg's argues that the purpose of the last sentence of Colo. Rev. Stat. § 13-21-401(1) is to protect consumers who are confused or misled and the purpose of § 13-21-402 is to protect consumers against injustice. Docket No. 108 at 15. Jeg's states that, where a consumer is not actually confused or misled, the rationale for the apparent manufacturer doctrine disappears. *Id.* The Court disagrees. The CPLA is aimed at imposing strict liability on those who create harm by placing a defective product in the stream of commerce. *See Johnston*, 830 P.2d at 1143. Section 13-21-401(1) defines the term "manufacturer" accordingly, focusing on defendants' conduct in placing the product in the stream of commerce, without regard for why a particular consumer chose to purchase a particular product. To require an injured party to affirmatively prove that the actual consumer was confused or misled by the defendant's labeling of a particular product would be contrary to the purpose of the CPLA and to its enumerated definitions of "manufacturer." Thus, the Court does not believe that the Colorado Supreme Court would, in applying the apparent manufacturer doctrine, require a plaintiff to prove that a consumer was actually deceived as to the origin of a product. Rather, the Court is persuaded by the approach set forth in *Hebel*, which evaluates the applicability of the apparent manufacturer doctrine through the lens of the reasonable purchaser.

There is no dispute that Jeg's held itself out to the public as the manufacturer of the flexplate. Jeg's website and catalog identify flexplates as Jeg's products and Jeg's promotes such products as "engineered and manufactured to the highest quality standards." Docket No. 103 at 10, ¶ 40; *cf.* Restatement (Second) of Torts § 400 cmt. d. Jeg's is listed on SFI's website as a manufacturer of flexplates. Docket No. 103 at 10, ¶ 39. The SFI certification sticker's reference to "This Manufacturer" was intended

to refer to Jeg's and the flexplate (and others like it) was packaged in boxes bearing Jeg's name.  Docket No. 103 at 9, ¶ 33.  Although Mr. Smith testified that some people may interpret Jeg's advertising as asserting that Jeg's manufactures its products and other people may "know, you know, where products come from and who's – and who is the manufacturer," Mr. Smith did not indicate on what basis a reasonable member of the buying public could conclude anything other than that Jeg's manufactured the flexplate.  Docket No. 103-13 at 14, pp. 259:24-260:22.  When asked directly how a consumer viewing Jeg's catalog and website could determine who manufactured the flexplates, Mr. Smith stated: "[consumers] would believe that Jeg's is the manufacturer." *Id.*

Jeg's unsuccessfully attempts to create a genuine dispute as to this question. Jeg's argues that Mr. Savoya knew that Jeg's "was just a parts house, and not the actual manufacturer" and that Jeg's packaging did not "confuse Mr. Savoya into believing that Jeg's manufactured the flexplate."  Docket No. 108 at 15-16.  However, Jeg's does not assert that Mr. Savoya represents a reasonable member of the buying public and, as such, this argument is largely irrelevant.  *See Hebel*, 442 N.E. 2d at 203. Moreover, Jeg's does not offer any evidence that, in light of how the flexplate was marketed and packaged, a reasonable member of the buying public would conclude that, simply because Jeg's is a parts house, Jeg's did not manufacture the flexplate. No such evidence is apparent to the Court.  Even assuming that Mr. Savoya represents a reasonable member of the buying public, which Jeg's does not assert, Jeg's argument lacks support.  Mr. Savoya was asked generally to define a "parts house" and responded that he thought of parts houses as retail centers, but not manufacturers.

39

Docket No. 108-4 at 3, p. 12:13-21.  Later Mr. Savoya was asked directly if he knew who manufactured the flexplate and responded, "No. . . . I mean, Jeg's could have made it, for all I know.  I don't know who made it.  I didn't ask them."  Docket No. 114-3 at 3, p. 86:13-19.  At most, this testimony suggests that Mr. Savoya did not know and did not particularly care who manufactured the flexplate; it does not, as Jeg's argues, establish that he knew that Jeg's did not manufacture the flexplate or establish that he was not confused as to the identity of the flexplate's actual manufacturer.

Jeg's appears to argue that, because its name was not actually stamped on the flexplate itself, it should not be considered to have placed its own label on the flexplate.  Docket No. 108 at 15 (citing *Long*).  This argument ignores the fact that the SFI certification sticker referred to Jeg's (although not by name), and the marketing and packaging materials bore Jeg's name.  Under the circumstances, this fact is not sufficient to create a genuine dispute of fact on this issue.  *Cf. Louviere v. Ace Hardware Corp.*, 915 So. 2d 999, 1002 (La. Ct. App. 2005) (holding that otherwise unlabeled bungee cord bearing "Ace" on the price tag raised dispute as to whether defendant labeled the bungee cord as its own).

There is no dispute that Jeg's did not disclose the identity of Autocraft (or Master Craft) as the manufacturer of the flexplate.  Jeg's concedes as much, Docket No. 108 at 8, ¶ 45, and there is no evidence in the record that Jeg's provided consumers with information from which a reasonable member of the buying public could deduce that anyone other than Jeg's manufactured the flexplates.  Plaintiff has provided sufficient evidence establishing that Jeg's held itself out to consumers as the manufacturer of the flexplate and did not otherwise disclose that Autocraft and/or Master Craft were the

actual manufacturers.  Jeg's has failed to identify evidence creating a genuine dispute of fact as to this issue and concedes that it is both in the business of selling flexplates and sold the flexplate at issue to Mr. Savoya.  *See* Docket No. 108 at 8, ¶¶ 46-47. Thus, plaintiff's motion for summary judgment as to Jeg's will be granted.[17]

## V.  JEG'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Jeg's argues that plaintiff's exemplary damages claim fails for lack of evidence and that both his exemplary damages claim and negligence claims fail for lack of causation.  Docket No. 102 at 12, 17.

### A.  Exemplary Damages

A claim for exemplary damages under Colo. Rev. Stat. § 13-21-102(1)(a) is not a separate claim, but rather is "auxiliary to an underlying claim for actual damages." *Palmer v. A.H. Robins Co.*, 684 P.2d 187, 213 (Colo. 1984).

> In all civil actions in which damages are assessed by a jury for a wrong done to the person or to personal or real property, and the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct, the jury, in addition to the actual damages sustained by such party, may award him reasonable exemplary damages. The amount of such reasonable exemplary damages shall not exceed an amount which is equal to the amount of the actual damages awarded to the injured party.

§ 13-21-102(1)(a).  A party requesting damages must prove his or her entitlement to them beyond a reasonable doubt.  *Webster v. Boone*, 992 P.2d 1183, 1189 (Colo. App. 1999).

Willful and wanton conduct is defined as "conduct purposefully committed which

---

[17]The Court need not therefore reach the question of whether Jeg's is a manufacturer because it altered or modified the product.  *See* Colo. Rev. Stat. § 13-21-401(1).

the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." § 13-21-102(1)(b).  "Where the defendant is conscious of his conduct and the existing conditions and knew or should have known that injury would result, the statutory requirements of section 13-21-102 are met."  *Coors v. Security Life of Denver Ins. Co.*, 112 P.3d 59, 66 (Colo. 2005).

In order to be entitled to exemplary damages, a plaintiff's injury must be "attended by" circumstances of fraud, malice, or willful and wanton conduct.  § 13-21-102.  Jeg's argues that the phrase "attended by" should be interpreted as "caused by," such that the conduct set forth in § 13-21-102 must be the sole cause of plaintiff's injuries.  Jeg's argument is without merit.  The plain language of the statute does not support Jeg's interpretation.  Had the General Assembly intended to limit exemplary damages to situations where aggravating circumstances are the sole cause of a plaintiff's injuries, the General Assembly could have expressed such an intent directly.  Moreover, Jeg's cites no Colorado case that has approved of its interpretation.  To the contrary, the Colorado Supreme Court has noted that an exemplary damages claim is auxiliary to an underlying claim for damages, applying "only when a civil wrong has been attended by aggravating circumstances."  *Palmer*, 684 P.2d at 213-14 (quotation omitted); *see also Wake v. SSC Greeley Centennial Operating Company, LLC*, 991 F. Supp. 2d 1143, 1149 (D. Colo. 2013) (finding that willful and wanton conduct was "a contributing cause of the incident"); *Coors*, 112 P.3d at 65 ("[§ 13-21-102] requires that punitive damages shall only be awarded in a civil action where the party asserting the claim proves beyond a reasonable doubt that the injury sustained was *attended* by

42

circumstances of fraud, malice, or willful and wanton conduct" (emphasis added)).

Thus, the question is whether plaintiff's injuries were attended by Jeg's willful and

wanton conduct. *See Palmer*, 684 P.2d at 213-14.

Plaintiff argues that Jeg's acted in a willful and wanton manner when it affixed an

SFI certification sticker over the NON SFI stamp. Docket No. 106 at 14. SFI tests only

internally balanced flexplates and does not therefore test the integrity of balance weight

welds. Docket No. 102-1 at 2, ¶ 6. Thus, according to plaintiff's expert witness

Stephen Knapp, it is standard industry practice and approved SFI methodology to test

flexplates that do not have an external balance weight. *Id.* at 2, ¶ 7. If a flexplate

without an external balance weight has passed SFI testing, it is a common and

accepted practice in the industry to "certify the equivalent flexplate in its externally

balanced configuration as well. These externally balanced flexplates with SFI 29.1

certification are approved for use in NHRA sanctioned events." *Id.* at 3, ¶ 11. However,

SFI Technical Manager Michael Hurst states that SFI "does not examine or test flex

plates with balance weights attached. It is the responsibility of the manufacturer to

ensure the strength of the welds attaching balance weights. SFI takes no position with

regards to such balance weights." Docket No. 102-3 at 3, ¶ 11.

Jeg's submitted an internally balanced flexplate to SFI for testing. Docket No.

102 at 6, ¶ 19. The flexplate passed and, because Jeg's believed the internally

balanced flexplate to be a representative sample of its externally balanced flexplates, it

chose to affix an SFI certification sticker over the NON SFI stamp on the flexplate

model at issue. Docket No. 102 at 6-7, ¶¶ 19-20. Mr. Knapp states that the f act that a

flexplate has a balance weight does not alter the fact that the flexplate has been SFI

certified.  Plaintiff substantially disputes only two of these facts.  First, plaintiff argues

that, although Mr. Knapp states that it was common practice to affix an SFI certification

sticker to an externally balanced flexplate, Jeg's has identified no evidence that SFI

authorizes or approves the practice of affixing an SFI certification sticker to an

externally balanced flexplate.  Docket No. 106 at 4, ¶ 10.  Second, plaintiff argues that

an internally balanced flexplate is not representative of an externally balanced flexplate

and, in support of his argument, cites the following portion of Mr. Smith's deposition

testimony:

> Q  Okay.  So the internal[] flexplate is not representative of an externally
> balanced flexplate?
>
> *        *        *
>
> A  I just – you know, that's a wide open question.
>
> Q  . . . I need an answer.
>
> A.  No.

Docket No. 106-2 at 15, pp. 230:25-231:6.[18]  Although the parties spend a great deal of

their briefs on this issue, suffice it to say, Jeg's has not eliminated all genuine dispute of

fact or provided sufficient evidence for the Court to conclude, as a matter of law, that it

did not act reckless disregard in representing the flexplate as SFI certified.  Moreover,

Jeg's fails to address an additional aspect of its conduct.  Master Craft stamped the

flexplates with a NON SFI designation because it believed the flexplates were not

suitable for racing and were not built to an SFI standard.  Docket No. 106-1 at 3,

---

[18]During the deposition, Jeg's counsel objected to the question as vague.  Jeg's
has not reasserted that objection in the present motion.

p. 131:5-24. In order for the flexplate to be suitable for racing, Mr. Haswell stated that additional engineering analysis would need to be done. *Id.* at 3, p. 132:3-10. Jeg's admits to deliberately placing an SFI certification over the NON SFI disclaimer in order to prevent consumers from seeing the NON SFI stamp. Docket No. 106 at 7, ¶¶ 12-14; *see also* Docket No. 106-2 at 18, p. 246:11-24. Jeg's concealed the NON SFI stamp knowing that the manufacturer did not intend the flexplate for racing and without knowing whether the welds on the balance weight were sufficient for racing. This deliberate act of concealing the manufacturer's stated warning that the flexplate not be used for racing purposes is, by itself, a sufficient basis to conclude that Jeg's conduct was willful and wanton. *See Coors*, 112 P.3d at 66. Moreover, although Jeg's believed Autocraft to be the manufacturer of the flexplates and although Autocraft does not appear to have objected to Jeg's performing SFI testing on internally balanced flexplates, *see* Docket No. 102 at 6, ¶¶14-18, Jeg's provides no evidence that it sought or received explicit approval from Autocraft to conceal the NON SFI designation on externally balanced flexplates, thereby creating the possibility that such flexplates would be used for racing in derogation of how Master Craft manufactured the flexplates. Jeg's does not identify any evidence indicating that it made any reasonable attempt to ascertain the identity of the flexplates' actual manufacturer or to ascertain whether the flexplates had been engineered or manufactured to withstand use in a race vehicle. Thus, there is evidence upon which a reasonable juror could conclude that Jeg's concealed the NON SFI designation in reckless disregard of the possibility that the flexplates were not engineered or manufactured for racing use. *Cf. Klingemann v.*

*Breg*, No. 10-cv-01797-WJM-CBS, 2012 WL 1378640, at *6 (D. Colo. April 20, 2012)

(denying summary judgment on exemplary damages claim because genuine dispute of

fact existed as to whether defendant knew or should have known of risk of injury if

product was used in certain application).  As discussed below, but for the SFI

certification sticker on the flexplate, plaintiff would not have been injured.  Thus, a

reasonable juror could find that plaintiff's injuries are attended by willful and wanton

conduct of Jeg's.

In addition, plaintiff argues that Jeg's acted in a willful and wanton manner with

respect to inspecting its flexplates.  Jeg's admits that it marketed the flexplates it sold

as "SFI approved for drag racing . . . .  Final plate inspection guarantees customer

satisfaction.  A final 100 percent inspection is performed before any flexplate is placed

in the packaging to assure total customer satisfaction."  Docket No. 106 at 5, ¶1; Docket

No. 118 at 3.  However, Jeg's admits that it did not test or inspect the externally

balanced flexplates it sold.  Docket No. 106 at 6, ¶ 2; *see* Docket No. 106-2 at 6, p.

55:8-11 ("Q  . . . Did Jeg's perform any inspections on any externally balanced

flexplates that it sold?  A  No.").[19]  Jeg's appears to argue that the marketing statement

is not a misrepresentation because the statement does not specify that Jeg's would

itself perform an inspection.  Docket No. 118 at 3, ¶ 1.  Although Mr. Smith testified that

Jeg's relies "on the manufacturer as being [the] final inspection," Docket No. 106-2 at 6,

p. 54:22-23, Mr. Smith later testified that Jeg's did not inspect Autocraft's (or, for that

matter, Master Craft's) facilities and otherwise have any way of knowing what quality

---

[19]Mr. Smith testified that, in 2012, Jeg's may have begun examining the ring gear on some flexplates, but he could not recall specifics.  *Id.* at 7, pp. 58:19-60:25.

control standards the flexplate's manufacturer was using. *Id.* at 16-17, pp. 240:17-241:3.  Moreover, Mr. Smith stated that he was not aware of any quality control that Autocraft was performing on the flexplates, did not request quality control documents, and that Jeg's did not perform inspection testing for itself. *Id.* at 19-20, pp. 252:17-253:10.  As a result, a fact finder could conclude, beyond a reasonable doubt, that Jeg's willfully misrepresented that its flexplates underwent an inspection and recklessly made no attempt to determine whether the flexplates were properly manufactured.

Moreover, had the flexplate been inspected as Jeg's promised, there is evidence that the defective balance weight welds could have been discovered.  Mr. Skaggs testified that a visual inspection of the flexplate at issue prior to installation would have revealed to a capable inspector that the balance weight welds were improperly fused. Docket No. 106-6 at 2-3, pp. 40:23-41:25.  Jeg's expert witness Stephen Knapp stated that externally balanced weights may be spin tested according to the Society of Automotive Engineers (SAE) standard J1240 Flywheel Spin Test Procedure for testing flexplates with counterweights.  Docket No. 106-8 at 8.  Jeg's arguments are insufficient to justify granting summary judgment on this aspect of plaintiff's exemplary damages claim.

Jeg's argues that plaintiff cannot claim that it was willful and wanton with respect to its testing and inspection procedures because such conduct was not alleged in the "Exemplary Damages" section of plaintiff's amended complaint.  Docket No. 118 at 9. Jeg's argument is without merit for two reasons.  First, Jeg's has not previously challenged the sufficiency of the pleadings and the Court does not construe Jeg's motion for partial summary judgment as a Fed. R. Civ. P. 12(b) motion.  Thus, the

question is whether plaintiff has stated a claim under Rule 56.  *See Flint ex rel. Flint v. Kentucky Dep't. of Corr.*, 270 F.3d 340, 348 (6th Cir. 2001).  "The formal issues framed by the pleadings are not controlling on a motion for summary judgment; the court must consider the issues presented by the other material offered by the parties on the motion to determine whether the Rule 56 request should be granted."  10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2721 (3d ed. 2015); *accord Flint*, 270 F.3d at 348; *Yates v. Transamerica Ins. Co., Inc.*, 928 F.2d 199, 202 (6th Cir. 1991); *Marsh v. Austin-Fort Worth Coca-Cola Bottling Co.*, 744 F.2d 1077, 1079 n.4 (5th Cir. 1984). The Court is not therefore strictly bound by the facts alleged in the pleadings and can appropriately consider additional facts in considering whether a reasonable juror could find that plaintiff is entitled to exemplary damages. *See* 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2722 (3d ed. 2015) (noting that, at summary judgment, the court "may evaluate the pleadings both in terms of their content at the time of their submission and as they might be amended at some later date").  Second, the amended complaint puts Jeg's representations regarding its inspection procedures at issue.  The exemplary damages section of the amended complaint accuses Jeg's of deceptively marketing the flexplate, despite having never tested an externally balanced flexplate, by placing an SFI certification sticker over the NON SFI stamp.  *See* Docket No. 64 at 28-29, ¶¶ 247-60.  The amended complaint elsewhere alleges that Jeg's represented that flexplates undergo a final inspection.  Docket No. 64 at 12, ¶ 111; *Id.* at 15, ¶ 139. Thus, the amended complaint provided Jeg's with sufficient notice that it could have to defend its marketing representations as well as its testing and inspection procedures.

Jeg's argues, without citation to the record, that its procedures were, on the whole, in accordance with or did not fall below industry standards.  Docket No. 102 at 2; Docket No. 118 at 3, ¶ 2.  Not only does Jeg's fail to provide evidentiary support for such an argument, compliance with industry standards is not, by itself, an appropriate basis upon which to grant summary judgment.  *See Lambert v. Park*, 597 F.2d 236, 239 (10th Cir. 1979) (noting that it is well settled that "proof of compliance with the applicable 'industry' standard will not insulate a defendant from liability when the standard itself is inadequate.").

Jeg's contends that, prior to the incident involving plaintiff, it was aware of only one occasion where its flexplates' balance weight welds failed.  Docket No. 118 at 7, ¶ 18.  However, the number of previous incidents with a particular product is but one consideration in evaluating an exemplary damages claim.  *Cf. Rowan v. Vail Holdings, Inc.*, 31 F. Supp. 2d 889, 900 (D. Colo. 1998) ("There were several close calls with the picnic deck before Rowan was killed, including a knee injury to a tester who tried to avoid hitting the picnic deck.  Vail did not add any protection to the deck, despite the apparent man power and ability to do so.").  Moreover, a fact finder could find that even a single prior incident was sufficient to place Jeg's on notice of the problem.

Because there is sufficient evidence from which a reasonable jury could conclude that plaintiff's injuries were attended by Jeg's willful and wanton conduct, Jeg's motion for summary judgment as to plaintiff's exemplary damages claim is denied.[20]

---

[20]Because the Court concludes that a genuine issue for trial exists as to whether Jeg's conduct was wilful and wanton, the Court need not consider whether Jeg's

## B.  Causation

Jeg's argues that plaintiff's negligence claim fails for lack of causation.  Docket No. 102 at 19.  Jeg's argues that the only action it took with respect to the flexplate was attaching the SFI certification sticker and that, because plaintiff has not shown that the SFI or racing use of the flexplate caused the balance weight to break loose, Jeg's did not cause plaintiff's injuries.  Docket No. 102 at 18-19.  As discussed above, causation is ordinarily a question of fact.  Jeg's has raised no evidence disputing that, but for the Jeg's representation that the flexplate was SFI certified, Mr. Savoya would not have purchased the flexplate and, but for the flexplate's SFI certification sticker, Mr. Savoya would not have been permitted to operate his race vehicle at the Dragway.  Thus, Jeg's conduct was a necessary component of the causal set that caused plaintiff's injury. *See Reigel*, 292 P.3d at 985.  Mr. Cornelissen testified that higher rates of acceleration could cause a higher load on the flexplate.  Docket No. 101-8 at 2, p. 110:2-21. Although this testimony lacks context, it lends minimal support to the proposition that the racing use of the flexplate subjected it to additional stress.  Thus, although plaintiff's injuries may have also been caused by an intervening force, namely, defective balance weight welds, that intervening force does not, under the circumstances, relieve Jeg's of liability as a matter of law.  *Scharrel*, 949 P.2d at 94.  Moreover, Jeg's does not establish, as a matter of law, that plaintiff's injuries were wholly unforeseeable or outside the scope of risk created by its conduct.

Plaintiff argues that Jeg's negligent conduct is not limited to its placement of an

conduct evidenced "circumstances of fraud."  *See Amber Props, Ltd. v. Howard Elec. & Mechanical Co., Inc.*, 775 P.2d 43, 46 (Colo. App. 1988).

SFI certification sticker on the flexplate, but contends that Jeg's negligently took no steps to inspect or otherwise verify the integrity of the flexplate.  Docket No. 106 at 19. As discussed above, there is evidence that a visual inspection of the flexplate would have revealed a defect in the balance weight welds.  Although Jeg's contends that its conduct conformed with industry standards, Jeg's contention is unsupported and not a sufficient basis to dismiss plaintiff's negligence claim.

For the above-stated reasons, Jeg's has failed to establish a genuine dispute of material fact as to the element of causation of plaintiff's negligence claim.  This aspect of Jeg's summary judgment motion will therefore be denied.

## VI.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Master Craft's Motion for Summary Judgment [Docket No. 101] and Jeg's Motion for Partial Summary Judgment Regarding Plaintiff's Pursuit of Exemplary Damages and Regarding Plaintiff's Negligence Claim [Docket No. 102] are **DENIED**.  It is further

**ORDERED** that plaintiff's Motion for Partial Summary Judgment [Docket No. 103] is **GRANTED** in part and **DENIED** in part as indicated in this order.

DATED September 18, 2015.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge